CINDY PIERCE,　　　　　　　　　:　　No. 3:09cv079
　　　　　　　　　　　　　　　　 :　　No. 4:09cv097
　　　　　　　　　**Plaintiff**　　 :
　　**v.**　　　　　　　　　　　　:　　**(Judge Munley)**
　　　　　　　　　　　　　　　　 :
DOLGENCORP, INC.,　　　　　　　 :
　　　　　　　　　　　　　　　　 :
　　　　　　　　　**Defendant**　　:
:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## <u>MEMORANDUM</u>

Before the court for disposition is Defendant Dolgencorp, Inc.'s motion for summary judgment on Plaintiff Cindy Pierce's claims under the Fair Labor Standards Act, 29 U.S.C. § 213(a)(1). (Doc. 65).[1] The motion has been fully briefed and is ripe for disposition.[2]

## BACKGROUND

This case is one of several actions brought by Dollar General Store Managers alleging that Defendant Dolgencorp, Inc. owes them overtime-pay under the Fair Labor Standards Act.[3] Defendant Dolgencorp, Inc. ("Dolgencorp") hired Plaintiff Cindy Pierce ("Pierce") in December of 1998 to work as a cashier at its store in Westfield, Pennsylvania. (Pierce Dep. at

_____

[1] All citations to document numbers refer to the docket in <u>Altemose v. Dolgencorp, Inc.</u>, No. 3:09cv079, into which Pierce's case was consolidated for pre-trial purposes.

[2] Likewise, Defendant Dolgencorp, Inc. also filed a motion to strike plaintiff's evidence. (Doc. 100). In our recent opinion in the related case of <u>Plaunt v. Dolgencorp, Inc.</u>, No. 1:09cv084, we denied the motion as moot because we had not relied on any of the evidence to which Dolgencorp objected. (Doc. 116). We have not relied on any of the evidence in ruling on the instant motion for summary judgment on Plaintiff Cindy Pierce's claim.

[3] Pursuant to the parties' joint stipulation, Defendant Dolgencorp, Inc. is the proper party defendant in this action. (<u>See</u> Doc. 38).

14, 16 (Doc. 81-7)). Dollar General stores are small retail outlets selling mainly consumable items. (Id. at 17). Pierce was promoted to Third-Key Clerk (a clerk entrusted with a key) and then, in February of 2001, promoted again to Assistant Store Manager ("ASM"). (Id. at 21, 23 - 24). On May 26, 2001 Pierce was promoted to Store Manager after interviewing with the District Manager. (Id. at 26; Personnel Action Form (Doc. 65-3 at 5)). Pierce spent one week in another store to receive training on the Store Manager position. (Pierce Dep. at 52 -53). Pierce continued as Store Manger at the Westfield Dollar General Store until June or July of 2003. (Id. at 112). As Store Manager, Pierce was the only salaried employee and the only employee classified as exempt. (Id. at 83).

As Store Manager, Pierce had at least one ASM, and one lay clerk. (Pierce Dep. at 56 - 57). Pierce managed a labor budget of over 200 hours per week. (Id.) In June of 2001, when Pierce started as a Store Manager, she earned $355.77 per week. (Id. at 44). In April of 2002, Pierce earned $423.08 per week. (Id. at 44 - 45). Pierce understood that her salary was meant to compensate her for as many hours as she worked. (Id. at 45). Pierce typically worked fifty to sixty hours per week, but perhaps as much as sixty-five hours per week. (Id. at 27, 29). Pierce was eligible for a bonus equal to 15% of her store's net profit. (Id. at 45 - 47). In 2002, Pierce received bonuses of $7,150.25 and $1,072.53 which she shared with her ASM and clerks. (Id.; Payroll Records (Doc. 65-7 at 9)). Pierce was the highest paid employee in her store. (Pierce Dep. at 83). Her ASM earned $6.20 per hour. (Id. at 48).

Pierce's supervisor was District Manager John Stewart. (Pierce Dep. at 49). Stewart would visit Pierce's store in Westfield once every four or five months for two to three hours. (Id. at 50 - 51). Stewart would change the layout of the store based on new corporate "planograms." (Id. at 50).

2

Stewart did not have an office at the store– only Pierce had an office.  (Id. at 52).  In addition to Stewart's visits, he would sometimes conduct district-wide teleconferences about once per year.  (Id. at 51).

As a Store Manager, Pierce performed the following managerial duties:

- Pierce interviewed and hired fourteen employees without District Manager approval (Pierce Dep. at 33 - 37, 83);
- Pierce trained employees (id. at 63 - 64, 67, 92);
- Pierce disseminated and enforced corporate policies (id. at 38, 40 - 41, 43);
- Pierce evaluated employee performance, including disciplining employees, firing employees, and promoting employees (id. at 31 - 32, 36, 41, 79 - 81, 116 - 117);
- Pierce ensured store security (id. at 61, 67, 107);
- Pierce ensured a safe working environment (id. at 105 - 106);
- Pierce controlled store expenses (id. at 87 - 88, 93 - 94);
- Pierce monitored sales, damages, employees and hours (id. at 29 - 31);
- Pierce directed her employees' work assignments (id. at 94 - 95, 132 - 133);
- Pierce schedule her employees' hours (id. at 67 - 68, 90 - 91, 94 - 95).

ASMs did not perform these managerial sorts of functions.  (Id. at 24 - 25, 70).  Pierce also performed the job functions listed in the Store Manager Job Description.  (Pierce Dep. at 64; Store Manager Job Description (Doc. 69-2)).  Pierce always supervised her employees. (Pierce Dep. at 67).  As Store Manager, Pierce had a Standard Operating Procedure ("SOP") Manual to which she would refer every couple of months.  (Id. at 61 - 62).

3

The SOP Manual laid out how all tasks and job functions were to be performed.  (Id.)

Pierce prevented theft by monitoring the cash register, handling store returns, inventorying deliveries, training employees on shoplifting, checking the trash, and handling all bank deposits and logs.  (Pierce Dep. at 67, 88, 95 - 96, 101, 100, 102).  Pierce handled all store paperwork.  (Id. at 66, 102).  Pierce spent 25 - 30% of each day doing paperwork and 50% of her time overall.[4]  (Id. at 123, 128).  It took Pierce five or six hours to make a work schedule.  (Id. at 94).  Pierce had some discretion to mark-down prices but at the end of her employment those decisions required approval at a higher level.  (Id. at 98).  Pierce required approval of her District Manager to take a day off of work.  (Id. at 104).  Pierce requested a security alarm for years, but her requests were not granted until the store was burglarized.  (Id. at 106 - 107).  Pierce spent one to two hours per day walking the aisles making sure items were displayed correctly.  (Id. at 86).  Pierce differentiated her store from local competition by focusing on cleaning, stocking shelves, and friendly customer service.  (Id. at 59).

Pierce received all store mail and was responsible for storing employee envelopes.  (Pierce Dep. at 101 - 103).  Pierce was also

---

[4] The parties do not clarify how Pierce could spend 25 - 30% of her time on paperwork during an average day, yet spend 50% of her time on paperwork overall.  The confusion may come from the fact that Pierce worked on paperwork at home because there was not enough time to do it during the day.  (Pierce Dep. at 128).  Thus the 25 - 30% estimate may refer to the amount of time she spent on paperwork while working at the Dollar General Store and the 50% estimate may refer to her time, in total, which includes hours she worked on paperwork while at home.  Or, Pierce simply had an inconsistent recollection of how much of her time she spent on paperwork.

responsible for taking recalled items off the shelves.  (Id. at 103).  Pierce handled customer complaints if another employee could not resolve it.  (Id. at 68).  Pierce called the repairman if something at the store needed to be fixed.  (Id. at 93).

Pierce was the leader of her store and was the employee most in charge.  (Pierce Dep. at 27).  Pierce's main responsibility was to ensure that her store was profitable.  (Id.)  According to Pierce, if she did not perform her managerial duties then sales would drop.  (Id. at 68).  Pierce considered keeping sales high as her highest priority and stated that the best way to keep sales high was to stock the shelves and have good employees.  (Id. at 68 - 69).  Pierce's Dollar General Store had annual sales of $1,474,712 in February of 2002.  (Id. at 57 - 58).

Pierce would stock shelves everyday for four or five hours.  (Pierce Dep. at 66).  While stocking, however, Pierce could simultaneously train and supervise other employees.  (Id. at 66 - 67).  Pierce and her ASM would make merchandise orders, which took an entire day.  (Id. at 65 - 66, 86 - 87).  On "truck days", when a large truckload of merchandise was delivered, Pierce would dedicate 75% of her time to unloading and inventorying the delivery.  (Id. at 132).  The store would sometimes receive two trucks per week.  (Id. at 56).  It would normally take two days to have the delivery items unloaded and stocked on the shelves.  (Id. at 90).  She would try to have all of her employees working on those days.  (Id. at 123).  Pierce would try to engage employees in one-on-one training on these days because she could not schedule enough labor hours to hold a dedicated training meeting.  (Id. at 121).

Merchandise would be laid out in the store according to a planogram– a diagram from the corporate headquarters specifying where each item should be placed in the store– but she had a small amount of

flex space to sell items at her discretion. (Pierce Dep. at 84 - 85). Pierce did not feel she had discretion to set up the store as she would have liked. (Id. at 130).

Pierce spent "a lot" of time both unloading and stocking deliveries. (Id. at 123). Pierce spent "a lot" of time doing non-managerial work. (Id. at 122). Pierce swept the floors five or six hours per week. (Id.) Pierce had a manager's office but did not spend much time in it. (Id. at 129). At one point, Pierce characterizes her work as being 50% paperwork and the rest as manual labor. (Id. at 123).

On more than one occasion Pierce requested additional labor hours for her budget. (Pierce Dep. at 121, 131). These requests were denied. (Id.) Pierce received excellent reviews in the area of "payroll control." (Id. at 73). Pierce attributed these positive reviews to personally working more hours. (Id.) Pierce resigned in June or July of 2003 because of stress. (Id. at 112).

On March 9, 2004, Pierce consented to become a party plaintiff in Brown v. Dolgencorp, Inc., No. 02-C-673-W, an FLSA action against Dolgencorp seeking overtime pay in the United States District Court for the Northern District of Alabama. (Pierce Dep. at 117 - 118; Consent to Become Party Plaintiff in Brown v. Dolgencorp, Inc., No. 02-C-673-W (Doc. 65-5)). On November 3, 2006 Pierce's case was consolidated for discovery purposes under CV-06-CO-1538-W. (Doc. 1).

On December 22, 2008, Pierce's case, along with twenty-two others, was transferred to this district from the United States District Court for the Northern District of Alabama by that court's order dated December 17, 2008. (Doc. 7). The case was initially assigned to the Honorable Thomas I. Vanaskie. (Id.) On February 24, 2009, the twenty-three cases were consolidated for pretrial purposes. (Doc. 30). By order of the court on

October 21, 2009, discovery was due April 30, 2010.  (Doc. 41).  On May 17, 2010, Dolgencorp filed a motion to sever the twenty-three cases for individual trials.  (Doc. 48).  On May 25, 2010, Dolgencorp filed the instant motion for summary judgment.  (Doc. 65).  By an agreed order dated May 27, 2010, the court stayed twenty-one of the twenty-three consolidated cases pending: (1) its decision on the motions for summary judgment on the claims of Plaintiff Johnna Plaunt and the plaintiff in this case; and (2) the Judicial Panel on Multidistrict Litigation's ruling on a motion to transfer the cases to another district.  (Doc. 75; <u>see</u> <u>also</u> May 10, 2010 Letter from MDL Panel (Doc. 64)).  On June 30, 2010 this case was reassigned from Judge Vanaskie to the undersigned.

On July 15, 2010, Dolgencorp filed a motion to strike evidence submitted by the plaintiff in opposition to the motion for summary judgment.  (Doc. 100).  On August 12, 2010, the Panel on Multidistrict Litigation denied the plaintiffs' motion to transfer the cases to the Northern District of Alabama for inclusion in MDL No. 1635.  (Doc. 106).  On September 16, 2010 the court consolidated two additional cases into No. 3:09cv079 for discovery purposes– <u>Shuback-Garrison v. Dolgencorp, Inc.</u>, No. 3:10cv834 and <u>Yasitis v. Dolgencorp, Inc.</u>, No. 3:10cv835.  (Doc. 109).  On December 14, 2010 we denied Dolgencorp's motion for summary judgment on the claims of Plaintiff Johnna Plaunt and denied as moot Dolgencorp's motion to strike the evidence.  (Doc. 115).  The parties have fully briefed the instant motion for summary judgment, bringing the case to is present posture.

**JURISDICTION**

The court has federal question jurisdiction over this case brought under Fair Labor Standards Act, 29 U.S.C. § 213(a)(1).  <u>See</u> 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions

arising under the Constitution, laws, or treaties of the United States.").

**LEGAL STANDARD**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing Fed. R. Civ. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

8

**DISCUSSION**

Dolgencorp raises three arguments in its motion for summary judgment. First, Dolgencorp argues that Pierce is exempt from the Fair Labor Standards Act's ("FLSA") overtime requirements because her primary duty was management. Second, Dolgencorp argues that Pierce is presumed to have had a primary duty of management under the Department of Labor's ("DOL") Field Operations Handbook and that Pierce, therefore, is exempt. Finally, Dolgencorp argues that any remaining claims under the FLSA are governed by a two-year statute of limitations. We will address each argument in turn.

**1. Primary Duty Test**

Under the FLSA, an employer must pay overtime to employees working more than forty hours per week. 29 U.S.C.A. § 207(a)(1). However, employers are exempted from paying overtime to "any employee employed in a bona fide executive, administrative, or professional capacity. . . ." 29 U.S.C.A. § 213(a)(1). This "executive exemption" is further delineated by DOL regulations. 29 C.F.R. § 541 (2003).[5] The applicable regulations define a "bona fide executive" as follows:

> The term employee employed in a bona fide executive [] capacity in section 13(a)(1) of the act shall mean any employee:
> (a) Whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; and
> (b) Who customarily and regularly directs the work of two or more other employees therein; and

---

[5] The DOL modified the regulations regarding the executive exemption, effective on August 23, 2004. See 69 F.R. 22122-01 (April 23, 2004). Because Pierce's employment with Dolgencorp ended before August 23, 2004, her claims are evaluated under the prior test. (See Pierce Dep. at 112 (Pierce resigned in June or July of 2003)).

(c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and
(d) Who customarily and regularly exercises discretionary powers; and
(e) Who does not devote more than 20 percent, or, in the case of an employee of a retail or service establishment who does not devote as much as 40 percent, of his hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (d) of this section: *Provided*, That this paragraph shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment, or who owns at least a 20-percent interest in the enterprise in which he is employed; and
(f) Who is compensated for his services on a salary basis at a rate of not less than $155 per week (or $130 per week, if employed by other than the Federal Government in Puerto Rico, the Virgin Islands, or American Samoa), exclusive of board, lodging, or other facilities: ***Provided, That an employee who is compensated on a salary basis at a rate of not less than $250 per week (or $200 per week, if employed by other than the Federal Government in Puerto Rico, the Virgin Islands or American Samoa), exclusive of board, lodging, or other facilities, and whose primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein, shall be deemed to meet all the requirements of this section.***

29 C.F.R. § 541.1 (2003) (emphasis added).

Subsection (f), emphasised above, then, states what is referred to as the pre-2004 executive exemption "short test" because if subsection (f) is satisfied, then the court may dispense with subsections (a) through (e). Id. at § (f). Split into elements, under the "short test" such an employee must (1) be compensated no less than $250.00 per week, (2) regularly direct the work of at least two other employees, and (3) have a primary duty of management of a recognized subdivision of the enterprise. Id.

10

There is no genuine issue of material fact as to whether Pierce satisfies the first two objective criteria for determining bona fide executive status– Pierce earned more than $250.00 per week and regularly directed the work of two other employees. (See Pierce Dep. at 44 (Pierce earned $355.77 per week as Store Manager), 56 - 57 (Pierce directed ASM and clerk)).  (See also Joint Stipulation of Fact and Law in Brown v. Dolgencorp, Inc., No. 7:02cv673, ¶ 3 ("All Plaintiff/Opt-Ins were paid at least the statutory required minimum salary while they were Store Managers. . . ."), ¶ 4 ("All Plaintiff/Opt-Ins regularly and customarily supervised two or more other employees while they were employed as Store Managers. . . .") (Doc. 56-2)).

Thus, the only question is whether Pierce's primary duty was management of a recognized subdivision of the enterprise.  29 C.F.R. § 541.1(f) (2003).  The applicable regulations offer the following guidance on what constitutes "management":

> (a) In the usual situation the determination of whether a particular kind of work is exempt or nonexempt in nature is not difficult. In the vast majority of cases the bona fide executive employee performs managerial and supervisory functions which are easily recognized as within the scope of the exemption.
> (b) For example, it is generally clear that work such as the following is exempt work when it is performed by an employee in the management of his department or the supervision of the employees under him: Interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property.
> 29 C.F.R. § 541.102 (2003).

The applicable regulations also describe how an employee's "primary duty" is determined:

> A determination of whether an employee has management as his primary duty must be based on all the facts in a particular case. The amount of time spent in the performance of the managerial duties is a useful guide in determining whether management is the primary duty of an employee. In the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time. Thus, an employee who spends over 50 percent of his time in management would have management as his primary duty. Time alone, however, is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion. Some of these pertinent factors are the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.

29 C.F.R. § 541.103 (2003).

Thus, the inquiry into an employee's primary duty can be broken into several elements: (a) the amount of time spent on managerial duties; (b) the relative importance of the employee's managerial and non-managerial duties; (c) the frequency with which the employee exercises discretion; (d) the degree to which the employee is supervised; and (e) the relative salaries paid to the employee as compared to a non-exempt employee who performs the same non-managerial tasks.  Id.  The court will address each of these elements, in turn, and assess Pierce's primary duty under the totality of the circumstances.  See Counts v. South Carolina Elec. & Gas Co., 317 F.3d 453, 456 (4th Cir. 2003).

In conducting our analysis, we heed the counsel of the United States Court of Appeals for the Third Circuit that "[e]xemptions from the FLSA are to be narrowly construed against the employer, and the employer has the

12

burden of establishing an exemption." <u>Pignataro v. Port Auth. of New York and New Jersey</u>, 593 F.3d 265, 268 (3d Cir. 2010) (citing <u>Guthrie v. Lady Jane Collieries, Inc.</u>, 722 F.2d 1141, 1143 (3d Cir. 1983)).  We also focus on the evidence of record regarding Pierce's actual day-to-day activities, as opposed to generic job descriptions or performance evaluations.  <u>See</u>, <u>e.g.</u>, <u>Schaefer v. Indiana Michigan Power Co.</u>, 358 F.3d 394, 400 (6th Cir. 2004).

**(a) The amount of time spent on managerial duties**

Dolgencorp argues that the record supports a finding that Pierce spent most of her time performing managerial tasks.  For instance, Pierce, at one point, stated that she spent 50% of her time on paperwork.  Pierce also stated that she spent a certain portion of her time scheduling employees' hours and monitoring inventory levels.  Dolgencorp argues that if Pierce spent half her time on paperwork and spent additional hours on other managerial duties, then she necessarily spent a majority of her time on managerial tasks.

The record is not clear, however, as to whether Pierce spent a majority of her time on managerial duties, and we determine that a reasonable jury could conclude either way.  Pierce stated that she spent half of her time on manual labor, or, read another way, that she performed non-managerial labor during the hours she wasn't working on paperwork.  (Pierce Dep. at 123).  Further, her statements are inconsistent as to how much time she spent on paperwork– at one point she indicates 50%, at another she suggests 25 - 30%.  If Pierce spent only 25% of her time on paperwork, and spent the remainder of her time performing manual labor, then she would have spent a majority of her time performing non-managerial duties.  A reasonable jury could also conclude the additional managerial hours to which Dolgencorp refers– scheduling employee hours

13

and monitoring inventory levels– might have been subsumed in Pierce's paperwork estimate.[6]  Thus, a genuine issue of material fact exists as to whether Pierce spent a majority of her time on managerial or non-managerial duties.  Bearing in mind that this time inquiry is not determinative, and viewing the evidence in a light most favorable to Pierce, we find that this factor favors Pierce and analyze the remaining factors.[7]

**(b) The relative importance of the employees managerial and non-managerial duties**

The second element of the primary duty inquiry evaluates the relative importance of Pierce's managerial and non-managerial duties from the perspective of the employer, Dolgencorp.  See, e.g., Dalheim v. KDFW-TV, 918 F.2d 1220, 1227 (5th Cir. 1990) ("the employee's primary duty will usually be what she does that is of principal value to the employer"); Haines v. S. Retailers, Inc., 939 F. Supp. 441, 449 (E.D. Va. 1996)

––––––––––––––––––––

[6] Pierce also avails herself of the proposition that "[h]ow an employee spends her time working is a question of fact, while the question of whether the employee's particular activities exclude her from the overtime benefits of the FLSA is a question of law."  Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986).

[7] We would analyze the remaining factors even if the record was unequivocal as to whether Pierce spent a majority of her time on managerial duties.  Dolgencorp suggests that "[w]here an employee spends *more than* 50% of her time on managerial duties this scenario is dispositive– management is her primary duty."  (Def.'s Common Br. 6 (Doc. 55)).  This statement does not accurately reflect that the DOL plainly offers the "amount of time" inquiry as a "useful guide" and "a good rule of thumb."  29 C.F.R. § 541.103 (2003).  Thus, we will proceed to examine each factor.  See id. ("A determination of whether an employee has management as his primary duty must be based on all the facts in a particular case."; "Time alone, however, is not the sole test. . . .").

14

(treating relative importance "as a measure of the significance of the managerial tasks to the success of the facility").  One logical way of addressing this factor is to imagine how the store would function if the employee did not perform her non-managerial or managerial duties, alternatively.  See King v. Dolgencorp, Inc., No. 3:09cv146, slip op. at 23 (M.D. Pa. May 6, 2010) (report and recommendation on motion for summary judgment) ("If plaintiff did not perform her nonmanagerial duties, her Dollar General store may not have functioned well; but if she did not perform her managerial duties, the store would have been incapable of doing business.") (citing Thomas v. Speedway SuperAmerica, LLC, 506 F.3d 496, 505 (6th Cir. 2007)).

Dolgencorp argues that Pierce's daily work– as described in the Store Manager job description (Doc. 69-2) and performance evaluation (Doc. 51-6)– establishes the relative importance of Pierce's managerial functions to Dolgencorp's profitable operation of that store location. Dolgencorp also argues that the fact that Pierce's bonus was tied to the store's profitability shows that Dolgencorp valued Pierce's successful management of the store.

Pierce, argues that a reasonable jury could conclude that Dolgencorp actually valued Pierce's non-managerial duties– unloading trucks, stocking shelves, and running the register– most highly.  Pierce cited her effort in stocking the store was the most important thing she could do to keep sales high and make the store profitable.  The record indicates that non-exempt hourly employees shared the store's bonuses, that ASMs had similar job descriptions and identical performance evaluations as Store Managers; that the Store Manager job description contemplates manual labor; and that Pierce displayed merchandise based largely on dictated floorplans.

Here, as in King, the record indicates that if Pierce did not perform

15

her non-managerial functions– such as sweeping the floors, stocking the shelves, or unloading delivery trucks– the store would have been unkempt and run less smoothly.  A reasonable jury could conclude that if Pierce did not perform her managerial functions– including scheduling hours, training employees, directing employees, ordering merchandise, responding to complaints, and implementing safety policies– the store would not have functioned.  <u>See</u> <u>King</u>, No. 3:09cv146, slip op. at 23.  A reasonable jury could also conclude, however– given the fact that Pierce's ASM had a similar job description and the store's ability to operate in Pierce's absence– that if Pierce did not perform her managerial functions the store would have continued to operate, albeit less efficiently.  Pierce herself stated that if she did not perform her managerial duties the store would have operated but that sales would decline.

Furthermore, a reasonable jury could, just as plausibly, conclude that Dolgencorp valued Pierce's non-managerial contributions more highly than her managerial functions because Dolgencorp repeatedly refused to grant her more employee hours for her budget.  The jury could presume that if Dolgencorp truly derived more value from Pierce's management skills, it would have made efforts to free Pierce up so that she could manage in the store during operating hours, rather than work nights at home to complete paperwork.  By allegedly refusing to allot more labor hours for clerks and forcing Pierce to perform such manual labor herself, the jury could reasonably find that the manual labor was what Dolgencorp most valued.  Finally, Dolgencorp gave Pierce excellent reviews in the area of payroll control, which Pierce earned by working more hours herself.  A reasonable jury could conclude from this that Dolgencorp valued Pierce's manual labor more highly than her managerial functions.

**(c) The frequency with which the employee exercises discretion**

16

The third and fourth elements of the primary duty inquiry overlap somewhat, but are distinct. The third element assesses how frequently the employee is called upon to exercise discretion while the fourth asks the extent to which the employee is free from supervision.

> (a) Section 541.1(d) requires that an exempt executive employee customarily and regularly exercise discretionary powers. A person whose work is so completely routinized that he has no discretion does not qualify for exemption.
> (b) The phrase "customarily and regularly" signifies a frequency which must be greater than occasional but which, of course, may be less than constant. The requirement will be met by the employee who normally and recurrently is called upon to exercise and does exercise discretionary powers in the day-to-day performance of his duties. The requirement is not met by the occasional exercise of discretionary powers.

29 C. F. R. § 541.107 (2003).

Dolgencorp argues that Pierce exercised discretion on a daily basis: rearranging merchandise to increase sales; scheduling employee hours based on their personal needs; calling the repairman as needed; adjusting merchandise orders to make sure items were in stock; choosing new hires; training employees; assigning work; and allocating budgeted labor hours. Dolgencorp notes that Pierce only referred to the Standard Operating Procedures ("SOPs") a few times a year. In addition, Pierce had discretion to hire, promote, discipline, and fire employees.[8]

---

[8] Dolgencorp states that "several circuits have found that, as a matter of law, an individual in charge of a separate unit of a multi-unit retail chain has management as his primary duty *even if* the company implements detailed, perhaps even rigid, operating procedures." (Def.'s Common Br. 22 (Doc. 55) (citing Murray v. Stuckey's Inc., 939 F.2d 614, 619 (8th Cir. 1991); Donovan v. Burger King Corp., 675 F.2d 516, 521-22 (2d Cir. 1982); Donovan v. Burger King Corp., 672 F.2d 221, 227 (1st Cir. 1982)). For the reasons set forth in our December 14, 2010 opinion denying Dolgencorp's motion for summary judgment in the related case of Plaunt v. Dolgencorp,

Pierce argues that any small-scale discretion she might have had was tightly circumscribed by corporate manuals, policies, formulae, and floorplans. She notes that the labor budget imposed upon her limited the work she could assign, that merchandise location was dictated by a planogram, and that Dolgencorp SOPs regulated employee conduct down to the smallest detail. Pierce cites Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1273 (11th Cir. 2008) in support of her argument that Dolgencorp's detailed manuals and policies make her non-exempt. There, the Eleventh Circuit upheld a jury verdict in favor of the plaintiffs. Id.

> Plaintiffs presented evidence that store managers rarely exercised discretion because either the operations manuals or the district managers' directives controlled virtually every aspect of a store's day-to-day operations. The manuals and other corporate directives micro-managed the days and hours of store operations, the number of key sets for each store, who may possess the key sets, entire store layouts, the selection, presentation, and pricing of merchandise, promotions, payroll budgets, and staffing levels. The manuals even instruct store managers on the smallest details, such as how to arrange clip boards, what items go in each of the four drawers of the single file cabinet, and how to remove spots and chewing gum from store mats.

Morgan, 551 F.3d at 1270. Here, a reasonable jury could conclude that Dolgencorp's SOPs and policies were as detailed as those in Morgan, but

---

No. 1:09cv084, (Doc. 116), such an approach appears to be at odds with the first sentence of the DOL regulation explaining the primary duty inquiry and we decline to follow suit. See 29 C.F.R. § 541.103 (2003) ("A determination of whether an employee has management as his primary duty must be based on all the facts in a particular case."). We reiterate here, in contrast with the cases cited by Dolgencorp, above, that (1) standardized workplaces and detailed SOPs, economically beneficial as they may be, can be considered in a primary duty analysis, (2) the fact that an action makes an operation more profitable does not mean that the action is discretionary, and that (3) directing employees does not, in and of itself, necessitate a finding of discretion.

Pierce stated that she rarely referred to them– only every couple of months.  Thus, there can be no genuine issue of material fact as to whether these SOPs interfered with her discretion in the "day-to-day performance of [her] duties."  29 C. F. R. § 541.107 (2003).

Addressing the facts of Pierce's particular case, a reasonable jury could conclude that Pierce had no discretion to set the number of employees, because of her labor budget.  Pierce did not have discretion to lay out the store as she would like or to have a security alarm installed.  Pierce did not have discretion to take a day off without District Manager approval.  On the other hand, Pierce had complete discretion over whom to hire.  She also had discretion to promote, discipline, and fire employees.  Pierce did not need District Manager approval to do any of these things.  Pierce scheduled hours, trained employees, and handled complaints.  Pierce assigned tasks to her employees.  Except for the last month of her employment, Pierce could mark-down prices without District Manager approval.  Pierce had discretion to have repairs made as needed.  When the District Manager visited, he basically gave Pierce a new planogram showing how to lay out merchandise, but did not otherwise give Pierce direction.  Pierce rarely referred to the SOP Manual.  Weighing these facts, we find that there is no genuine issue of material fact but that Pierce exercised discretion on a day-to-day basis.

**(d) The degree to which the employee is supervised**

Dolgencorp argues that on the average day Pierce was the only manager at her store, and that District Managers only visited every four or five months.  These visits only lasted a few hours.  Stewart also interacted with Store Managers during a district-wide teleconference about once per year.  Thus, except for two or three days per year, Pierce operated without any physical supervision.

19

Pierce agrees that her District Manager visited rarely. She argues that Stewart closely supervised her meaningful decisions– those relating to the labor budget, employee pay raises, and whether Pierce could take a day off. Pierce also argues that, in effect, the corporate policies lingered daily as a form of supervision.

It is clear that District Mangers did supervise Store Managers. It is also clear that Pierce, as a Store Manager, operated within the constraints of corporate policies. However, she was certainly much more free from supervision than any of her employees, to the extent that comparison is instructive. The record establishes that on most days she had no contact with any supervisor. Once a year Pierce would join in a teleconference with Stewart– which cannot truly be considered supervision. Stewart would physically visit once every four months, for two or three hours. The supervision was clearly seldom. There is no genuine question as to whether Pierce was relatively free from supervision, therefore this factor favors exemption.

**(e) The relative salaries paid to the employee as compared to a non-exempt employee who performs the same non-managerial tasks**

The fifth and final element of the primary duty test compares the employee's salary to that of a non-exempt employee who performs the same non-managerial tasks. Dolgencorp argues that, on a weekly basis, Pierce earned 171% of her ASM's salary. Earlier, however, Pierce earned 143% of her ASM's salary.[9] Dolgencorp points out that Pierce considered

---

[9] Pierce earned $423.08 per week while her ASM earned $6.20 per hour. (Ex. C, Payroll Records (Doc. 65-7); Pierce Dep. at 48). At $6.20 per hour the ASM earned $248.00 per forty-hour week. Thus, at that time, Pierce earned 171% of her ASM's salary ($423.08 / $248.00 = 1.71). Earlier, Pierce had earned $355.77 per week while her ASM had earned

her compensation was substantially higher than her ASM's.

Pierce, noting that Dolgencorp's calculation assumes a forty-hour work-week which does not reflect the hours she actually worked, chooses to frame the comparison in terms of her effective hourly wage, based on fifty and sixty-hour work-weeks. (Pierce Dep. at 27; Pl.'s Common Br. 16 (Doc. 78) (citing <u>Jones v. Va. Oil Co., Inc.</u>, 69 Fed. Appx. 633, 639 (4th Cir. 2003)). <u>See</u> <u>also</u> <u>Myrick v. Dolgencorp, Inc.</u>, No. 7:09cv5, 2010 WL 146874, at *7 (M.D. Ga. Jan. 11, 2010) ("The Court finds no merit to Dollar General's argument that it is improper for Myrick to convert her salary to an hourly basis for comparison purposes."). For purposes of Dolgencorp's motion for summary judgment we view the record in a light most favorable to Pierce, and will assume a sixty hour work week. Converting Pierce's weekly salary to an hourly wage, assuming a sixty-hour work-week, Pierce earned between 96% and 114% of her ASM's hourly wage.[10] Under Pierce's means of calculation, early-on Pierce effectively earned less per hour than her ASM.[11]

Given the summary judgment standard, which requires that we view the evidence in a light most favorable to the non-moving party, we will

---

the same $6.20 per hour or $248.00 per week. (Ex. C, Payroll Records (Doc. 65-7); Pierce Dep. at 48). During this period Pierce earned 143% of her ASM's salary ($355.77 / $248.00 = 1.43).

[10] Having earned $355.77 per week and then $423.08 per week, assuming sixty hours of work, Pierce's effective hourly wage was $5.93 and then $7.05, respectively. Thus, Pierce effectively earned first 96% and then 114% of her ASM's hourly wage of $6.20 per hour ($5.93 / $6.20 = 0.96 and $7.05 / $6.20 = 1.14).

[11] At one point, Pierce stated that she worked as many as sixty-five hours per week, which would lower Pierce's effective salary even further. (Pierce Dep. at 27 - 29).

21

throw out the high range of each party's calculation.  This leaves comparative ratios of 143% and 96%.  Neither party's means of calculation is more "gymnastic" than the other– they are simply matters of perspective. (See Def.'s Common Br. 27 (Doc. 55) (quoting Moore v. Tractor Supply co. 352 F. Supp. 2d 1268, 1279 (S.D. Fla. 2004)).[12]  We would note, however, that the purpose of the primary duty analysis is to determine whether an employee is exempted from the FLSA's overtime requirements and that this element of the inquiry asks the court to determine "the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor."  29 C.F.R. § 541.103 (2003).  We find that converting Pierce's weekly salary into an effective hourly wage is most appropriate in order to find a common basis with which to compare the wages paid to others.  To ignore the fact that Pierce worked more than forty hours per week would largely frustrate the purpose of this inquiry: to determine whether the employer sought to subvert the FLSA by attaching an overtime exemption to an employee who otherwise performs the same non-exempt tasks as hourly employees.  The only comparison which approaches a standard of objectivity is to ask what an employer must pay the manager and the other employee, respectively, for

_____

[12] A third perspective might ask what Dolgencorp would have had to pay an ASM who worked sixty hours per week, as Pierce did.  At $6.20 per hour, Pierce's ASM would have been paid $248 per week for the first forty hours the ASM worked, and then another $186.00 per week for twenty hours of overtime at a time-and-one-half rate, that is, $9.30 per hour.  This total is $434.00 per week.  Pierce earned $355.77 per week and then $423.08 per week, yielding ratios of 82% and 97% of her ASM's salary, accounting for her ASM's overtime.  Thus, under this third perspective Pierce earned less than her ASM would have if the ASM had worked as many hours as Pierce.

22

the same amount of nonexempt work. Without some standard unit, there can be no useful comparison in this already-amorphous inquiry. Finally, this approach is most consistent with the proposition that "[e]xemptions from the FLSA are to be narrowly construed against the employer, and the employer has the burden of establishing an exemption." <u>Pignataro</u>, 593 F.3d at 268. Accordingly, we find that a reasonable jury could conclude that Pierce's effective hourly wage ratio was 96% of her ASM's hourly wage, and that a genuine issue of material fact exists as to whether Pierce's compensation was significantly higher than the wages paid to other employees.

Weighing all of these factors, under the totality of the circumstances, and noting that the burden of proving an exemption lies with the employer, Dolgencorp, we conclude that summary judgment is not warranted in this case. Dolgencorp has not established that there is no genuine issue of material fact as to whether Pierce's primary duty was that of management. First, a genuine issue of material fact exists as to whether Pierce spent a majority of her time performing managerial duties. Second, a genuine issue of material fact exists as to which of Pierce's functions– managerial or non-managerial– were valued most by Dolgencorp. Third, a reasonable jury could find that Pierce's salary as a manager did not differ significantly from wages paid to non-exempt employees. Dolgencorp has established that there is no genuine issue of material fact as to whether Pierce exercised discretion on a day-to-day basis or as to whether Pierce operated with a significant degree of freedom from supervision. Balancing these factors, we determine that Dolgencorp's motion for summary judgment should be denied.

## 2. DOL Field Operations Handbook Presumption

Dolgencorp argues, based on the DOL Field Operations Handbook

23

("Handbook"), that Pierce is presumed to have had management as her primary duty.  Dolgencorp argues that the DOL will presume that an employee that (1) is in charge of small retail store and (2) is paid substantially higher wages than her subordinates has management as her primary duty.  (See Def.'s Common Br. 31 n.106 (Doc. 55) (citing Ex. 18, Department of Labor's Field Operations Handbook (Doc. 56-26)).

The Handbook states, "[f]or example, management personnel in small retail or service establishments who are in charge of the establishment during their tour of duty and are paid substantially higher wages than their subordinates will typically meet the primary duty test." (Doc. 56-26 at 3)).  We decline to presume that Pierce meets the primary duty test.  First, the excerpt from the Handbook is clearly advisory, and we have already performed a full primary duty analysis.  Second, having performed our analysis, we find that there is a question of material fact as to whether Pierce was paid substantially higher wages, therefore the presumption is not, by its own terms, appropriate.

## 3. Statute of Limitations

Dolgencorp argues that Pierce has not shown a willful violation of the FLSA, and that, therefore, the court should apply a two-year statute of limitations to Pierce's claims and not a three-year statute of limitations. See 29 U.S.C. § 255(a) (An action for unpaid overtime "may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued").  This would bar any claim for overtime before March 9, 2002, two years before Pierce consented to bring this action on March 9, 2004.  However, "[w]hether a violation of the FLSA is willful is a question of

24

fact. . . ." <u>Pignataro</u>, 593 F.3d at 273 (citing <u>Bianchi Trison Corp. v. Chao</u>, 409 F.3d 196, 208 (3d Cir. 2005)).  Therefore, we decline to rule on the applicable statute of limitations.

**CONCLUSION**

For the reasons stated above, we determine that there are genuine issues of material fact which remain for trial, and that Dolgencorp's motion for summary judgment shall be denied.  We decline to impose a two-year statute of limitation on Pierce's claims at this time.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

CINDY PIERCE,                             :    No. 3:09cv079
                                          :    No. 4:09cv097
                           **Plaintiff**   :
            v.                            :    **(Judge Munley)**
                                          :
DOLGENCORP, INC.,                         :
                                          :
                           **Defendant**   :
::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## ORDER

**AND NOW**, to wit, this __3rd__ day of February 2011, upon
consideration of Defendant Dolgencorp, Inc.'s motion for summary
judgment on Plaintiff Cindy Pierce's claims (Doc. 65) , it is HEREBY
**ORDERED** that the motion is **DENIED**.

**BY THE COURT:**


 s/ James M. Munley
**JUDGE JAMES M. MUNLEY
United States District Court**

26